The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. May it please the Court. My name is George Chutney and I represent the petitioner Dr. Alan Braun. Dr. Braun is an internationally recognized expert on the neural bases of language, sleep, and motor function. He has been published over 125 times in numerous scientific journals. At the time this case arose, Dr. Braun was a tenured research scientist in one of the institutes at NIH. In 2016, Dr. Braun's institute removed him for negligent performance of his duties. Mr. Chutney, let's get right to the point of tenure. What is your understanding of the role of tenure at NIH for a federal employee? Thank you, Judge. The NIH has promulgated a special performance policy applicable to all of its scientists who are hired under Title 42. The performance part of the policy adds a specific requirement for tenured scientists such as Dr. Braun. Specifically, the policy, which is mandatory, provides that, and I'm quoting, tenured scientists must undergo the detenuring process before a performance-based action may be taken against them. But what does it mean to say you're a tenured scientist? Is this just an honorific of some sort? No. The NIH institutes are run similar to a faculty at a university. Entering scientists have to work there for some period of time before they can be tenure-track, and then they have to be voted on by NIH. And when they receive tenure, that tenure is similar to what a professor at a university would get. And specifically with respect to NIH, a tenured scientist is offered protections which are not available to the ordinary non-tenured scientists or any of the other federal employees at NIH. And one of those protections is exactly what we're discussing here today, Judge Newman. Paragraph K-3 of the performance policy makes it absolutely clear that any performance-based discipline of a tenured scientist must come subsequent to detenuring. Well, unless it's for cause, right? No. A performance-based action is separated from for cause. Can I ask you this question? Because I think we're right at the heart of what I guess I've been focusing on. So the paragraph H of the policy, or Section H, talks about termination for unacceptable performance. Section L1 talks about termination for cause. Why isn't it quite natural to understand that, to mirror the distinction between Chapter 43 and Chapter 75 in Title V of the U.S. Code, which we long ago, in a number of cases, Lovshin, Farrell, and I think we followed this for a long time, recognized allowed for-cause removals for sufficiently negligent or otherwise bad performance of the job? The reason that that does not apply here is because the NIH has specifically segregated out a performance-based discipline. And I want to make it clear that paragraph H1 does not refer just to removal. It refers to a performance-based action of any kind. And the NIH is not the Veterans Affairs Administration. It's not the Department of Defense. It's not HUD. The NIH has chosen for itself to require specific procedural protections for tenured scientists. Judge, I am not suggesting here that a scientist, a tenured scientist, whose performance has deteriorated to a level that would warrant removal cannot be removed. What I am suggesting is that the- What does the detenuring process look like and who performs it? There's a special tenuring committee, a committee on tenure at the NIH, and they vote on awarding tenure and they vote on removing tenure. And all the evidence in this record, and it's repeated in my brief and my reply brief, is that if a scientist's scientific performance is believed to have deteriorated to the point that he can no longer credibly perform his research, that scientist must first be referred to the tenure committee to determine whether or not that is true. If the tenure committee decides that the performance of the research scientist, the tenured research scientist, has deteriorated to the point that they no longer warrant the protection of tenure, then they can be referred out for performance or discipline or anything else. But the initial procedural protection for tenured scientists is that tenure first has to be removed. Okay, but your problem is that there's an exception for cost. And whether or not that exception mirrors the difference between Chapter 43 and the traditional removal provision, it does create an exception so that in some circumstances things that are performance-based can result in a discharge without going through the detenuring process, right? No. No? I mean, it says specifically that scientific misconduct isn't that performance- Well, I- Wait, wait, wait. I'm sorry. It says scientific misconduct is an example of a four-cause removal. And scientific misconduct is a performance-based removal, is it not? No. Scientific misconduct is a creature of its own, Judge. The scientific misconduct is defined as falsification or manipulation of data. That is an extraordinarily serious allegation against a scientist. Maybe so, but it relates to performance, doesn't it? No, because before a scientist can be charged with scientific misconduct, there is an Office of Research Integrity at NIH, which must make a finding that scientific misconduct has been engaged in. If, in fact, a scientist is found to have engaged in scientific misconduct, then found by that office, then they can be removed for cause based on the finding of scientific misconduct. But as with performance, and, Judge, what do you have to say? Wait, I understand what you're saying. But the fact is that for cause must encompass something that is performance-based when it talks about scientific misconduct. And this is only an example, personal and scientific misconduct, only an example of the types of for-cause removals, right? It is one of the examples in paragraph L, but it is not performance-based. Scientific misconduct is an intentional action by a research scientist. Falsification and manipulation of data is not negligent, and I dare say it is not performance. If, in fact, and I'm not saying that performance can never cross over the line into malfeasance or cause, we're not suggesting that. We're suggesting, however, that before that line can be crossed, in any case involving a tenured scientist, the tenure committee must evaluate that scientist and make that determination first. Otherwise, Judge, I suggest that paragraph H and K, setting forth the protections for tenured scientists, is a nullity because any institute can say, oh, my gosh, your performance has crossed the line and now it's malfeasance or for cause it's misconduct, and therefore we don't have to follow the performance policy. The performance policy itself makes no exceptions with respect to performance for a tenured scientist. If the NIH believes that, you know, what you're suggesting is correct in that the NIH should be treated as any other agency with respect to Title 42, Chapter 43, and Chapter 75, they can issue a policy which says that. They have not. And, you know, let me just say that the judge in this case, the administrative judge, I've crossed into my time, the administrative judge specifically found in this case that it is undisputed that ensuring compliance with basic research requirements was part of Dr. Braun's express duties as a senior investigator. The agency's charge of negligence in the performance of his duties is sustained. That finding, standing alone, requires reversal because before the judge could get to examining the merits of Dr. Braun's performance, the detenuring committee had to first deal with the board. Before we run out of time, let me ask you one other question. Sure. Do you agree that his failure to follow the protocols extensively was a serious performance problem? Yes, we do. However, the implications of that failure, as we pointed out in our brief, 103 other scientists were found by their institutional research board to have engaged in serious and continuing noncompliance. None of them was terminated. None of them was disciplined. None of them was referred to the detenuring committee. The decisions on basic research science and what it means if a scientist does X or Y or Z, that has to be determined first by the scientists at NIH who are charged with that. And in the case of a tenured scientist, that is the tenure committee. Well, the government says that all of those other scientists then voluntarily left or retired, not that there was some sort of withholding of a procedure on the part of NIH that those other scientists might have been subject to. Is that correct? Some scientists resigned. Some of them. Some of the 103 did. Most of them did not, and they continued their research. They were not referred to the detenuring committee, and they were allowed by the IRB if they could remedy the problems that the IRB had found, which they offered Dr. Braun. I just want to say, a tenured scientist at NIH has two protections. The first is the tenuring committee, but the second is the IRB, which if it agrees with the institute, in this case, that Dr. Braun's performance was continuing and serious noncompliance, they give him a chance. The IRB gives the scientist a chance to come up with a plan to remedy his errors. And the institute, in this case, not only short-circuited the tenure committee, they also short-circuited the IRB. They terminated Dr. Braun or told the IRB they were terminating him before he even had a chance to present his remedy. Okay. Any more questions from the panel at this stage from Massachusetts? We'll save this for rebuttal time. Thank you, Judge. All right. Let's hear from the other side. Ms. Kramick. Thank you. Good morning, Your Honors, and may it please the Court. This case presents the issue of whether the agency acted reasonably in removing for cause a scientist running an NIH study who provided complete records for approximately 8% of its participants over a six-year period of time. We're talking about the procedure that was undertaken. Whether there may or may not have been basis ultimately for removal is an important question, but not the only question. And the concern, I think a valid one, is the procedure. It does look as if there was almost a hasty procedure. I didn't see anything in the record to explain why this procedure was followed. Is there anything you can enlighten us on? Thank you, Your Honor. The agency here followed the procedures for terminations for cause under Chapter 75, which as one of Your Honors mentioned just a few minutes ago, we believe is mirrored in the agency's performance policy. Chapter 75 requires a PIP, a performance improvement plan, and a number of other safeguards that seem to have been shortcut here. Your Honor, the performance-based actions under Chapter 43 would require a performance improvement plan before removal. But as I understand it under this Court's decisions in Lovshin and Farrell, those procedures are not required for a for-cause removal under Chapter 75. And I think that the policy being mirrored in those two sections is evident from Section H1 of the performance policy, which is at Appendix Page 627 and which we've already been discussing. But this entire paragraph about termination for unacceptable performance first discusses a performance improvement plan, and then at the end of the paragraph provides that when an employee is tenured, then the detenuring process must also apply before a performance action can be taken following a performance improvement plan. And Section L of the policy, again, as we've already been discussing, Section L of the policy discusses terminations for cause, which are an exception to the requirement to detenure before removal. How would you draw the line between a performance-based action that has to go through detenuring and a for-cause removal that relates to performance? Well, Your Honor, I'm not sure that there can be drawn a bright-line rule between a performance-based performance action and a misconduct-based. That's not an acceptable answer. There has to be some sort of standard for drawing the line. What do you think is the standard? Well, Your Honor, I think the standard would be that the agency at some level has discretion, if the performance is in a gray area, to follow the procedures under Chapter 43 or the procedures under Chapter 75. You're saying there's no way to draw a line between the two? Well, Your Honor, I think one of the relevant questions is whether a performance improvement plan would have been effective in improving an employee's performance. And in this case, the agency witnesses testified... Why shouldn't the line be drawn in terms of the seriousness of the misconduct, which is what I understand Loesch and these other cases to say about the difference between Chapter 43 and Chapter 75? Isn't that the line that's drawn there? Oh, Your Honor, yes. I agree that the question is as to the seriousness. I am not sure whether there is a bright line you could draw that says this action is serious enough and this action is not serious enough. I think at some level, it is left to the agency discretion as to which chapter to pursue. And again, I think one of the relevant questions is the effectiveness of a performance improvement plan. And because that is the primary procedural difference between Chapter 43 performance-based actions and Chapter 75 for-cause actions is that the performance improvement plan is not required under Chapter 75 actions. And here, the agency witnesses testified that in this case, they did not believe that a performance improvement plan would have been effective in improving Dr. Brown's performance. Is there any law under Chapter 75, if it's a performance-based removal, how serious it has to be to come under Chapter 75 as opposed to Chapter 43? Well, Your Honor, this court's decision in Farrell, I think, does in part answer your question. The court, in looking at the removal of an employee who was a medical technologist at the VA and had made several errors in recording blood test results, the court found that where the conduct indicates levels of negligence that are sort of beyond simple negligence, that when it's serious enough, it can fall into misconduct, neglect of duty, or malfeasance. And the court went on to say, again, that it was not appropriate to require notice of deficiencies, counseling, or an opportunity to improve when sort of the confidence of the employee, the employee has been destroyed. But here there was no finding of neglect of duty or malfeasance. I mean, I do think it's important for all of this attention, which has been given to tenure and academic tenure and its significance at NIH, and now we're told it doesn't really matter if the agency doesn't like what you're doing. That ends it. Well, Your Honor, of course the detenuring process does play an important role, again, in performance-based actions. But why wasn't it conducted here? Well, Your Honor, I think that Section K3 of the policy, which sort of discusses the tenure removal process, is enlightening, because it mentions that the agency in detenuring a scientist has to show their inability to function as a productive member of the scientific community and others. It's related to the scientific achievement of the scientist, whereas here the agency witnesses testify that this was an issue of misconduct. It was not relating to Dr. Braun's knowledge or his skill as a scientist, but it was something else. It was misconduct as to record-keeping and providing proper histories and physicals of the patients that were participating in the study. Could the line here be between the kind of conduct which can be remediated by a performance improvement plan and the kind of conduct that causes you to lose faith in the employee and that no remediation would cure that? Yes, Your Honor. Could the line be between something that has to go through the detenuring process and something that can be for cause removal? Yes, Your Honor, that is what I have been intending to suggest that the line is. One of the relevant questions is whether a performance improvement plan would be effective. Another question is as to the seriousness of the conduct, and perhaps there's an element of agency discretion involved as well. But in this case, when you're talking about hundreds of improperly kept records over a six-year period of time, the agency reasonably believed that this is not the kind of conduct that could be remediated with a performance improvement plan, and it was of such a serious nature that a for-cause removal was the appropriate action under Chapter 75. And I do briefly want to respond to the suggestion that came up at the end of argument that Dr. Braun could have remediated the studies with the IRB, and the agency did not give him a chance to do so. The agency here was under no obligation to hold off on its decision to remove Dr. Braun until the IRB remediation meeting had occurred, and both the deciding official and the IRB chair testified in this case that the IRB remediation would have been focused, again, on the science of the study and not on Dr. Braun himself or Dr. Braun's conduct, and that the disciplinary decisions of the agency are a completely separate process. Can I interrupt and ask you this question? This is Judge Taranto. Can you address the point about how NIH treated the numerous other scientists that Dr. Braun points to as, in a way, sufficiently comparable to raise a question about differential treatment here? Yes, Your Honor. As the administrative judge found, many of the other employees that had engaged in similarly serious conduct had chosen to separate from the agency or retire before a disciplinary action could be taken. What about the others? It's a fairly large number, so there might be many who did not retire and were allowed to continue in their positions without a removal action. Your Honor, I guess I can't speak to the specifics of the factual situations behind all of those employees, except to say that the administrative judge had found that none of them were appropriate comparators for purposes of determining whether removal was the appropriate action under the Douglas factors. Was a case made of any specificity about seriousness of the conduct in those cases? I recall there was some label like serious violations of protocols and or continuing violations of protocols. I apologize, Your Honor. I really, I guess, can't speak to the specifics of those situations, except to say that the administrative judge at Appendix Page 25 found that in other circumstances involving similar scope, which is to say serious continuing noncompliance, resulted in the scientist either leaving or retiring or somehow separating from the agency before a disciplinary action had been taken. So I would suggest that the others were found not to be of a similarly serious nature. Do you happen to know what the evidence in the record was about the details of the incidents that are on that table? Your Honor, I don't. And we did not address this sort of specifically in our brief, because I think it wasn't really a question that has sort of been brought up in the appellant's opening brief other than sort of as in sort of mentioning and passing. And so, again, I think that the administrative judge in this case found that there were not other serious instances in which the employee was able to continue working sort of at the same level of seriousness. You're saying that there was an explicit finding on that point? A specific finding by the administrative judge? Yes, the administrative judge found. So that was what I was questioning. Yes, the administrative judge's decision on this point is at Appendix Page 25 at the bottom of the page where he says that other similar instances resulted in the employees leaving the agency for another job or via retirement. And why does that justify ignoring tenure in this case? Your Honor, I don't think it justifies ignoring tenure. This question would go to whether removal is the appropriate disciplinary action under the Dunst or the Douglas factors. I don't think it answers or speaks to the question of tenure. Was Dr. Braun eligible for retirement? I believe he was, Your Honor, because he did, in fact, choose to retire the effective day of his termination. If Your Honors have no further questions, then we would ask the Court to affirm the decision of the MSPB in this case. Any more questions from the panel for Ms. Koenig? Nothing for me, thank you. No. All right, Mr. Chusey, you have your rebuttal time. Thank you, Judge. I just want to address for a moment, and the Court, I think, rightfully is concerned with the distinction between performance on the one hand and conduct on the other hand. I want to give you a fact which is cited in my brief and in the appendix. The deciding official who decided that Dr. Braun should be removed testified that he was unaware that conduct and performance were treated differently for tenured scientists. And that testimony is at pages 110 and 111 of the appendix. He also acknowledged that misconduct was not alleged in the proposal and was only discussed in the context of the decision, which is at pages 112 and 113 of the appendix. And the employee relations specialist who assisted with the proposal testified that she could not recall if the proposal involved misconduct or whether it was even discussed when drafting the proposal. And that's at page 115 of the appendix. The fact of the matter is that when the proposal was issued, cause was not mentioned. It was not discussed. Efficiency of the service was not referred to. No mention of misconduct of any kind. That was something that was added. What page is the proposal at? The proposal is on page... I've got a lot of pages here. The proposal is at pages 28, 27 to 30 is the proposal. And the only allegation is negligent performance. That's all. And even in the decision, the only charge was negligent performance. Actually, gross negligence. I'm sorry? Gross negligence is at 829, isn't it? No. Gross negligence is thrown in. Gross negligence is a specific charge that has to be raised, and it was not. In fact, in the decision itself, the deciding official says that he was, for the table of penalties, he was relying on negligent performance, which is a reprimand to removal for a first offense. But, you know, my argument is that we don't even get to the table of penalties until you get to the tenuring. The tenuring has to be the threshold in a case like this. Otherwise, tenured scientists, the protection of tenure is gone. If the decision on that line between performance and conduct is made by the chain of command, rather than an independent office such as the tenure committee, then protection is gone. Thank you, Judge. Okay. Anything else? Final words, Mr. Chusey? No. I just want to indicate that the table of penalties, not the table of penalties, the table of the other 103 scientists who were brought before their institutional review board were charged with the same charge that Dr. Braun was, serious and continuing noncompliance. And there is no evidence in this record as to how many resigned and how many were simply allowed to resume their research. But none of them was disciplined in any way. And I'm talking reprimand, PIP. None of them was disciplined in any way. And just to be clear, those are records from the IRB, which is not in the business of removing, right? Would those records reflect a disciplinary decision? Or am I misunderstanding in too narrow a way the role of the IRB? No. You are correct that the IRB does not issue decisions with respect to discipline. However, in our discovery questions, we asked how many of the 103 scientists were disciplined. And the answer came back, and it's on page, I think, 97 and 98 of the appendix. The answer was none. No discipline of any kind was issued except for Dr. Braun, and he was removed. Thank you. Okay. Any more questions for Mr. Cheesy? No. Okay. Thank you. Thank you both. The case is taken under submission.